COURT OF APPEALS OF VIRGINIA

Present: Judges Fulton, Ortiz and Lorish
Argued at Richmond, Virginia

PUBLISHED

A.A., ET AL.

v.      Record No. 0876-23-2

J.M., ET AL.

J.M., ET AL.

v.      Record No. 0953-23-2

A.A., ET AL.

J.M., ET AL.

v.      Record No. 1855-22-2

A.A., ET AL.

J.M., ET AL.

v.      Record No. 0940-23-2

A.A., ET AL.

OPINION BY
JUDGE DANIEL E. ORTIZ
JULY 16, 2024

FROM THE CIRCUIT COURT OF FLUVANNA COUNTY
Claude V. Worrell, Judge[1]

Timothy M. Snyder (Brittany Marie Jones; Charles S. Dameron;
Damon Porter; Ehson Kashfipour; Blair Connelly; Zachary L.
Rowen; Lewis F. Powell III; Maya M. Eckstein; Trevor S. Cox;
Elizabeth S. Vaughan; Latham & Watkins, LLP; Hunton Andrews
Kurth LLP; Graham Law Firm, PPLC, on briefs), for A.A., et al.

John S. Moran; Samantha E. Freed, Guardian ad litem for the minor
child (Hannon E. Wright; Richard L. Mast; McGuireWoods LLP;
Tremblay & Smith, PLLC; Rakness & Wright, PLC, on briefs), for
J.M., et al.

---

[1] Judge Richard Moore originally presided over these matters. Upon his retirement, the
matters were reassigned to Chief Judge Claude V. Worrell.

Amicus Curiae: United States; Lewis S. Yelin, Attorney, Appellate Staff Civil Division (Richard C. Visek, Acting Legal Adviser; Caroline D. Krass, General Counsel; Brian M. Boynton, Principal Deputy Assistant Attorney General; Sharon Swingle, Attorney, Appellate Staff Civil Division; Jessica D. Aber, United States Attorney; Jonathan T. Lucier, Assistant U.S. Attorney; U.S. Department of Justice; U.S. Department of State; U.S. Department of Defense, on brief), for A.A., et al.

Amicus Curiae: Kids in Need of Defense (KIND) (Murad Hussain; Arnold & Porter Kaye Scholer LLP, on brief), for A.A., et al.

Amici Curiae: National Center for Youth Law; Young Center for Immigrant Children's Rights (Rebecca R. Wolozin; Kelly Albinak Kribs, on brief), for A.A., et al.

The power to adjudicate the adoption of a child and the associated termination of parental or familial relationships stems from the statutory framework enacted by the General Assembly. Well-meaning intentions and emergency circumstances are not enough to grant a court the authority or power to complete an adoption. This is especially true when a child is physically present in a foreign country—here, Afghanistan—that has not waived jurisdiction.

Code § 63.2-1216 is a broad bar against attacking a final adoption order after six months. Despite this, the circuit court found that the A.s'[2] challenge—brought well past six months after the final adoption order—was not barred and that the final adoption order was void because the A.s are de facto parents with parental due process rights in Virginia. But we need not reach this issue. Instead, we affirm the circuit court's decision for a different reason—that while the circuit court had subject-matter jurisdiction over the adoption in general terms, it lacked the power to render the final adoption order, rendering it void ab initio. The court further lacked the power to render the interlocutory adoption order, making it also void ab initio; thus, we reverse the circuit court's decision to leave the interlocutory adoption order in place. We further reverse the

---

[2] Consistent with our February 16, 2023 order, we use the parties' initials to maintain their anonymity.

- 2 -

decision to maintain the temporary custody order, as we determine that the custody order is void ab initio because the circuit court lacked subject-matter jurisdiction to issue it. Finally, we remand the case to the circuit court to consider the A.s' request for custody of the child.[3]

BACKGROUND[4]

This case comes before us with a lengthy procedural history, revolving primarily around four court orders: (1) a custody order, issued November 6, 2019; (2) an interlocutory adoption order, issued November 10, 2019; (3) a final adoption order, entered December 3, 2020; and (4) an order voiding the final adoption order, dated May 3, 2023. In November 2019, J.M. and his wife, S.M., petitioned the Fluvanna County Juvenile and Domestic Relations ("J&DR") District Court for custody of a child living in Afghanistan. Based on representations by J.M. that the child was a stateless orphan with severe medical needs and no known family, the court granted the M.s custody. Following a petition by the M.s to adopt the child, the Fluvanna Circuit Court issued an interlocutory adoption order on an emergency basis. A year later, on December 3, 2020, the circuit court issued a final order allowing the M.s to adopt the child.

On March 28, 2022, the A.s, an Afghan couple whom the United States government had determined were relatives of the child,[5] petitioned the circuit court to vacate the final adoption order and grant them custody of the child. The M.s argued that the A.s lacked standing to challenge the adoption and that Code § 63.2-1216, which prohibits challenges to a final adoption

---

[3] This opinion does not preclude the M.s from filing further custody petitions.

[4] "Although parts of the record are sealed, this [consolidated] appeal requires unsealing certain portions to resolve the issues raised by the parties. To the extent that certain facts mentioned in this opinion are found in the sealed portions of the record, we unseal only those portions." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022).

[5] The M.s dispute the A.s' biological relationship to the child, asserting that the child's parents were non-Afghan nomadic terrorists and that the A.s have failed to provide DNA evidence or other documentary evidence of the relationship.

order after six months, barred their collateral attack.[6]  The A.s filed a motion for summary judgment.  The court denied the plea in bar and a motion to reconsider the plea in bar filed jointly by the M.s and the guardian ad litem.  On May 3, 2023, following several evidentiary hearings, the circuit court entered summary judgment in part for the A.s.  The court voided the final adoption order, finding that the A.s were de facto parents of the child and "were entitled to some process that they did not receive," and thus their claim was not barred by Code § 63.2-1216.  The court left in place both the interlocutory adoption order and the custody order.  The court then certified its entire May 3 order, including the most pertinent question of whether Code § 63.2-1216 and a lack of standing bar the A.s' claim.

Because this appeal comes before us following both the denial of a plea in bar and the partial grant of summary judgment—each of which requires us to review the facts through a particular lens[7]—we recite below the uncontested facts while also highlighting the material disputes between the parties.

In September 2019, the United States military found a severely wounded child, about six to eight weeks old, on a battlefield in Afghanistan.  The A.s claim that the child's parents were farmers killed accidentally in a U.S. airstrike, while the M.s assert that the child's biological parents were non-Afghan terrorists and the child's mother was killed when she attempted to detonate a suicide bomb.

---

[6] The M.s initially raised these arguments in two demurrers.  Although they did not file a written plea in bar, the parties agreed to proceed as if the demurrers were pleas in bar and the circuit court treated the demurrers accordingly.

[7] When considering a summary judgment motion, the court assesses the facts "in the light most favorable to the nonmoving party," but it is "not permitted to draw inferences that are forced, strained, or contrary to reason."  *Quadros & Assocs., P.C. v. City of Hampton*, 268 Va. 50, 51 (2004).  When considering a plea in bar, the circuit court's factual findings are "accorded the weight of a jury finding and will not be disturbed on appeal unless they are plainly wrong or without evidentiary support."  *Hawthorne v. VanMarter*, 279 Va. 566, 577 (2010).

Because of the child's serious injuries, United States servicemembers brought her to the Department of Defense's ("DOD") Bagram Air Base for medical help. Military leaders from the U.S. Forces-Afghanistan ("USFOR-A")[8] coordinated with the International Committee for the Red Cross ("ICRC") and Afghan government officials from the Afghan Ministry of Labor and Social Affairs ("Ministry"),[9] in their search for the child's relatives.

During this time, J.M. was deployed in Afghanistan as a Marine Corps Judge Advocate. He met the child and became concerned for her medical needs and placement. On October 23, 2019, J.M. attended a meeting with officials from the United States, Afghanistan, and the ICRC to discuss the family reunification search. The meeting minutes state that ICRC was "in contact with individuals claiming to be relatives of the infant. The Ministry and ICRC need to conduct a proper assessment to determine whether these are rightful claims."

J.M. began arrangements for the child to travel to the United States because he doubted that the medical care she needed could be provided in Afghanistan. The M.s petitioned the J&DR court for custody of the child. J.M. represented that the Afghan government did not want custody of the child or jurisdiction over the matter and that it did not object to United States officials assuming jurisdiction and custody. The court believed a waiver of jurisdiction would be provided in "a matter of days." The Afghan government, however, never waived its jurisdiction. J.M. also testified that Afghan representatives stated that they did not have the capacity to care for the child. The J&DR court issued the custody order on November 6, 2019, granting the M.s custody of the child.

---

[8] USFOR-A is "a component of U.S. Central Command responsible for joint U.S. military operations in Afghanistan."

[9] The Ministry is a government agency in charge of child protection programming, custody, and placement in Afghanistan.

Four days later, the circuit court issued the interlocutory adoption order based on the M.s' petition for adoption. The court granted the order on an emergency basis, relying on the M.s' statements that if the child was J.M.'s dependent, she could be evacuated from Afghanistan and receive medical care at the University of Virginia Health Children's Hospital ("UVA"). The interlocutory adoption order stated that the child was stateless, the search for relatives was unsuccessful, and the child was in urgent need of medical treatment. Although the child remained with the United States in Afghanistan on Bagram Air Base, the order stated that she was in the "physical care and custody" of the M.s in Virginia. Notwithstanding the emergency order, the child was not transported to the United States.

On December 31, 2019, the Ministry announced that it had identified the child's relatives, who had been vetted consistent with Afghan law. The Ministry identified M.I.[10] as the child's paternal uncle, and the Ministry and USFOR-A concluded that the child was an Afghan national. After a month, the Ministry requested that the United States transfer the child to the Afghan government for her to be united with her government-identified family, noting that it had granted custody to M.I. under Afghan law. The United States determined the Ministry had properly verified the child's family. Based on this, and Afghanistan's jurisdiction over the child, the United States chose to transfer the child to the Afghan government who would proceed to place the child in M.I.'s custody.

On February 26, 2020, after learning that the United States was planning to transfer the child, the M.s sought a temporary restraining order ("TRO") in the United States District Court for the Western District of Virginia to prevent the transfer. In this proceeding, the M.s relied on the custody order and did not disclose the interlocutory adoption order. The M.s' counsel represented that the M.s did not intend to adopt the child. The district court denied the M.s'

---

[10] M.I. is also referred to in the record as H.B., H.I., and H.M.

request for a TRO. The district court held that the M.s were unlikely to succeed on the merits because the custody order was based on Afghanistan's waiver of jurisdiction and Afghanistan had not yet waived jurisdiction. It further held that the DOD should have been provided notice of the custody proceedings. The next day, the United States government transferred the child to the Afghan government, which then placed the child with her new guardian, M.I. M.I. transferred guardianship to his son, A.A., identified by the United States and the A.A.s as the child's first cousin, and A.A.'s partner, F.A.[11]

After the circuit court issued the interlocutory adoption order, the M.s informed the court of "'red tape' and bureaucratic difficulties" with evacuating the child without a final adoption order. The M.s did not relay to the circuit court that the federal district court had denied their petition for a TRO, that Afghanistan had not waived its jurisdiction, or that the child had been transferred to people the United States had determined were the child's relatives. A timeline of events submitted to the court stated that the child was "turned over to [an] anonymous person in unknown location by ICRC" in February 2020. J.M. represented to the court that the child was being looked after by a young Afghan girl and that he had no specific information as to her identity. On December 3, 2020, the circuit court issued a final adoption order. The court based its order on the recommendations of the Fluvanna County Department of Social Services and the guardian ad litem's recommendation—neither of which had ever met the child—as well as the court's earlier finding that the child was a stateless orphan. The parties dispute whether the United States had notice at any stage of the adoption proceedings, and the circuit court did not make a conclusive finding on the issue. The A.s did not receive notice.

---

[11] The A.s argue that, according to Afghan law, as M.I. is the child's eldest uncle on her father's side he automatically became the child's legal guardian or *wali* once her father died. They further assert that as *wali* M.I. had the power to transfer the child to A.A. irrevocably. The M.s counter that the A.s' experts confirmed that this transfer was not in accordance with Afghan law.

Not long after the child was transferred to the A.s' physical custody, the M.s hired Kimberly Motley, an attorney practicing in Afghanistan, to locate the A.s. Motley contacted the A.s and told them that an American family wanted to provide the child with medical care. Motley tried to convince the A.s to send the child to the United States for medical treatment.

While Motley, the M.s, and the A.s were communicating, the Taliban was quickly overtaking Afghanistan. A.A. told J.M. that the Taliban had denied his request to send the child to the United States. Therefore, J.M. proposed to the A.s that they could come to the United States with the child. The M.s assert that J.M. made clear to the A.s that the M.s intended for the child to live with them, but the A.s dispute this. After the Afghan government collapsed on August 15, 2021, and following more than a year of communication, the A.s agreed to come to the United States. The United States asserts that when coordinating the evacuation of the A.s, J.M. "falsely informed U.S. personnel that the child was his 'daughter per both Afghan and U.S. court orders,' and he provided them with a fraudulent document that he described as an Afghan court order."[12] Though the child had lived with and been cared for by the A.s for as long as 18 months[13] and had been determined to be the A.s' relative, J.M. described the A.s only as a "Pashtun Couple" accompanying the child. The M.s counter that "the White House, the Office of the Vice President, the DOD, and members of Congress . . . supported the efforts to bring [the child] to safety." The M.s further allege that "[t]he Commandant of the Marine Corps approved" of J.M.'s actions "with full knowledge of the facts, including [the child]'s location and status as a patient in a U.S. military hospital."

---

[12] J.M. had an Afghan passport for the child with the name the M.s had given her. The passport photo was a digitally altered version of a photo that the A.s provided to Motley. F.A. states that when she asked about the name, J.M. told her to be quiet and that the purpose was for the child to obtain medical treatment and nothing else.

[13] The M.s dispute whether the child lived consistently with both F.A. and A.A. during this time.

In August 2021, the A.s first flew from Afghanistan to Germany, where they met J.M. in person. J.M. asserts that it was only upon meeting that he learned of F.A.'s attachment to the child and that A.A. had promised F.A. that the child would not leave her side if they left Afghanistan. Instead, J.M. believed that M.I. was responsible for the child, who was incidentally being cared for by a teenage girl.

Upon arriving in the United States, the A.s stayed on the military base at Fort Pickett, Virginia. On September 3, 2021, two police officers knocked on the A.s' door and told them they were being moved to a different apartment. They brought A.A., F.A., and the child to a car; a woman placed the child in a car seat and told the A.s that they were going to an interview. When they reached a meeting room, the woman from the car continued to hold the child. As the child tried to get back to F.A., the woman told her that the child could not legally remain with the A.s because they were not her biological parents. J.M. came into the room and said he was told that he must take the child, or she would be placed in an orphanage. As the child began to cry, F.A. begged the woman, saying, "[P]lease give me [my] daughter. She is my daughter. Please give her to me." A few days later, they discovered that a Virginia court had ordered the child's adoption by the M.s. The child has lived with the M.s ever since.

On March 28, 2022,[14] the A.s petitioned the circuit court to vacate the M.s' final adoption order and obtain custody of the child. Under 28 U.S.C. § 517, the United States filed two statements of interest. The United States argued that (1) the custody and adoption orders were void because of the M.s' misrepresentations and (2) the circuit court must defer to the federal government's foreign policy decisions to recognize Afghanistan's jurisdiction and transfer the

---

[14] The A.s originally filed the petition on December 8, 2021, under the docket number of the original adoption case. The circuit court required the A.s to refile their petition as a collateral proceeding, and their original briefs were incorporated in their case after refiling on March 28, 2022.

child to the Afghan government for family reunification.  The United States also filed two motions to intervene along with declarations of officials from the Departments of State and Defense.[15]  The court denied the motions without prejudice.

In its May 3, 2023 order, the circuit court stated that while the child's citizenship had initially been unclear, "it was determined that the child was Afghan," a fact the court felt was "important."  The court found "evidence of some extrinsic fraud" on the part of the M.s in obtaining the custody and adoption orders.  It further found that the A.s were de facto parents of the child and "were entitled to some process that they did not receive."  So the court voided the final adoption order, but left the custody order and interlocutory adoption order in effect.  The court also concluded that "the United States['] determination with regard to its foreign policy imperatives have been met" through its May 3 order vacating the adoption and that the May 3 order did not conflict with any federal foreign policy decisions.  The court then certified the May 3 order for consideration by this Court, staying any further proceedings concerning the best interests of the child.[16]

ANALYSIS

As this case is before us on interlocutory appeal, we first affirm that we have jurisdiction over all matters presented in the May 3 order certified for interlocutory review.  We then review whether the circuit court had authority to issue each of the three underlying orders in this case: the custody order, the interlocutory adoption order, and the final adoption order.  We conclude that the court lacked subject-matter jurisdiction to issue the custody order, making it void ab

---

[15] The M.s argue that these declarations were improperly admitted.  Because the issue is not addressed in the interlocutory May 3 order, this Court does not have jurisdiction to address the matter and will assume without deciding the declarations were properly admitted.

[16] Both the M.s and the A.s appealed the circuit court's order; we consolidated all four appeals for consideration here.

initio.  Whether the circuit court had jurisdiction to issue the interlocutory and final adoption orders is more complicated.  The circuit court had subject-matter jurisdiction over the adoption proceeding.  Yet it lacked the power to render the adoption orders because this adoption bore no resemblance to those authorized by the adoption code and the child was not present in the United States.  Thus, the adoption orders are void ab initio.  This is true even in light of Code § 63.2-1216's bar, because the power to render is indispensable and in its absence an order may be attacked at any time.  As we conclude that the final adoption order was void ab initio, we need not address the claim that the A.s are the child's de facto parents and that this gives them parental due process rights in Virginia.

### I.  The May 3 Order

We must first consider whether the Court has subject-matter jurisdiction over all the matters raised by the parties in this interlocutory appeal.  *See Morrison v. Bestler*, 239 Va. 166, 170 (1990) ("[A] court always has jurisdiction to determine whether it has subject matter jurisdiction . . . ."); *Minor v. Commonwealth*, 66 Va. App. 728, 737-38 (2016) ("[T]he question of jurisdiction is one for the determination of the appellate court only.  Before the merits of this case can be considered, [this Court] must determine whether it has jurisdiction." (alterations in original) (quoting *Comcast of Chesterfield Cnty., Inc. v. Bd. of Supervisors*, 277 Va. 293, 299 (2009))).  The M.s argue that the A.s' appeal, No. 0876-23-2, is improper.  They argue we cannot consider No. 0876-23-2 because the A.s are appealing the non-final May 3 order.

"[F]or the Court to have jurisdiction of this appeal, the order from which [the A.s] appealed must be either a final order or an interlocutory order from which an appeal is statutorily authorized." *Comcast*, 277 Va. at 300.  While the May 3 order is not final,[17] we conclude that

---

[17] Rule 1:1(b) describes an order as final "if it disposes of the entire matter before the court, including all claim(s) and all cause(s) of action against all parties, gives all the relief contemplated, and leaves nothing to be done by the court except the ministerial execution of the

the parties here are statutorily authorized to appeal the entirety of the May 3 order. Code § 8.01-675.5(A) permits any party to move for certification of an "order or decree for interlocutory appeal," and provides that a circuit court may certify an order for appeal if it makes certain findings. The Court may then, in its discretion, grant the appeal "from the interlocutory order or decree." *Id.* Here, in an order titled "Order Certifying for Interlocutory Appeal" issued on May 12, 2023, the circuit court stated that "*the May 3, 2023 Order* of this [c]ourt granting partial summary judgment is certified for interlocutory appeal pursuant to Virginia Code § 8.01-675.5." (Emphasis added). This Court granted the petitions for interlocutory appeal filed by both the M.s and the A.s "from certain orders entered by" the circuit court—meaning the May 3 order, as certified by the May 12 order. Because Code § 8.01-675.5 authorizes appeals from orders or decrees, as opposed to appeals of isolated issues, the Court may consider any issue raised by the parties that the circuit court addressed in the May 3 order.

## II. Subject-Matter Jurisdiction and The Power to Render

We turn first to the A.s' arguments about subject-matter jurisdiction. When issuing an order, a court must have subject-matter jurisdiction. "[S]ubject-matter jurisdiction is the paramount consideration in assessing whether a court has authority to enter judgment, and a judgment will always be void without it." *Watson v. Commonwealth*, 297 Va. 347, 352 (2019). Subject-matter jurisdiction "cannot be waived or conferred on the court by agreement of the parties." *Morrison*, 239 Va. at 169-70. "[A] judgment on the merits made without subject matter jurisdiction is null and void." *Id.* at 170. A court must also have the power to render any

---

court's judgment, order or decree." In the May 3 order, the circuit court contemplates further hearings to determine the best interest of the child. This is far from mere ministerial execution of an order. *See* Rule 1:1(b). Further, the circuit court in its May 12, 2023 order stated that the May 3 order involved a question of law that met the four elements required to certify an order as interlocutory under Code § 8.01-675.5. For these reasons, we find that the May 3 order is interlocutory.

- 12 -

decision or decree. *See Ellis v. Commonwealth*, 75 Va. App. 162, 167 (2022). This Court reviews questions regarding subject-matter jurisdiction and whether a lower court had the power to render a judgment de novo. *Gray v. Binder*, 294 Va. 268, 275 (2017); *Collins v. Shepherd*, 274 Va. 390, 397 (2007).

  *A. The J&DR court lacked subject-matter jurisdiction to issue the custody order.*

We first consider the J&DR court's subject-matter jurisdiction over the custody order. "As courts not of record, [juvenile and domestic relations district] courts are creations of the General Assembly." *Parrish v. Fannie Mae*, 292 Va. 44, 49 (2016) (citing Va. Const. art. VI, § 8; Code § 16.1-69.7). "They are courts of limited jurisdiction and may exercise only such subject matter jurisdiction as has been expressly conferred by statute." *Id.* Under Code § 20-146.12, Virginia's J&DR courts have "jurisdiction to make an initial child custody determination only if" a case falls within one of four categories. The following four categories are "the exclusive jurisdictional basis for making a child custody determination by a court of this Commonwealth." Code § 20-146.12(B).

A court may only make a custody determination if:

> 1. This Commonwealth is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth;
>
> 2. A court of another state does not have jurisdiction under subdivision 1, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under § 20-146.18 or § 20-146.19, and (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence and (ii) substantial evidence is available in this Commonwealth concerning the child's care, protection, training, and personal relationships;

3. All courts having jurisdiction under subdivision 1 or 2 have declined to exercise jurisdiction on the ground that a court of this Commonwealth is the more appropriate forum to determine the custody of the child under § 20-146.18 or § 20-146.19; or

4. No court of any other state would have jurisdiction under the criteria specified in subdivision 1, 2, or 3.

Code § 20-146.12(A).

None of these requirements is satisfied here. The first category's requirements are not met because the child was less than six months old and had never been to the Commonwealth prior to the issuance of the custody order. As to the second category, the J&DR court originally determined it had jurisdiction in part because the M.s represented that the child was stateless and that a waiver from Afghanistan was imminent. Yet J.M. attended a meeting at which Afghan officials and agents of the Red Cross informed United States officials that they had potentially identified the child's Afghan family members and planned to verify if this was a rightful claim. The M.s did not disclose this information to the court. The circuit court noted that "[t]here is evidence of some extrinsic fraud" here and that the circuit court "did not have all of the information known to the [M.s] at the time the [final] order was entered. For example, that there was no waiver coming and that the United States decided to surrender or give the child to the Afghan government." The circuit court also stated that "in the end, it was determined that the child was an Afghan [c]hild" and the circuit court deemed this "important." Had all the information been before the J&DR court, it could not have found that Afghanistan lacked jurisdiction and therefore the court did not have jurisdiction under the second category. *See* Code § 20-146.4(A) ("A court of this Commonwealth shall treat a foreign country as if it were a state of the United States . . . ."). Even if Afghanistan had declined jurisdiction, the M.s concede that the child did not have significant connections with the Commonwealth, which is sufficient in itself to find that the court lacked subject-matter jurisdiction under Code § 20-146.12(A)(2). For

- 14 -

the third category, no other states declined jurisdiction on the basis that the Commonwealth was the more appropriate forum. Lastly, the catchall fourth category's requirements are not met because Afghanistan had jurisdiction. Because the custody order does not meet the requirements of any of the four categories that provide the J&DR court with exclusive jurisdiction to make a custody determination, we find the custody order void for lack of subject-matter jurisdiction.[18] Therefore, we reverse the circuit court's finding that the custody order remains valid.[19]

### B. The circuit court had subject-matter jurisdiction over the final and interlocutory adoption orders but lacked the power to render the orders.

We next evaluate whether the circuit court had authority to issue the interlocutory and final adoption orders. The A.s argue that the circuit court's subject-matter jurisdiction is limited to the categories of adoption contained in the adoption code and that the present case does not fit any of these categories. The M.s rely on *Bonanno v. Quinn*, 299 Va. 722 (2021), for the proposition that the circuit court had subject-matter jurisdiction over the adoption proceedings. The Supreme Court in *Bonanno* stated that "circuit courts have subject-matter jurisdiction to adjudicate adoptions" and the "power to adjudicate adoption petitions under Code §§ 17.1-513 and 63.2-1201." *Id.* at 735. Code § 17.1-513 states that circuit courts "shall have original and general jurisdiction of all civil cases." Code § 63.2-1201 explains what an adoption petition must contain, who may file it, and where it can be filed. It does not contain any language

---

[18] The M.s also argue that Afghanistan's child custody laws violate fundamental principles of human rights and therefore the J&DR court had jurisdiction under Code § 20-146.4(C). That section states that "[a] court of this Commonwealth need not apply this act if the child custody law of a foreign country violates fundamental principles of human rights." Code § 20-146.4(C). Nothing in the record demonstrates that Afghanistan's child custody laws violate fundamental principles of human rights as they relate to the child in the present matter.

[19] We also note that the custody order is no longer active, as the J&DR court stated that it was "a temporary order" that "did not finally dispose of the matter." The J&DR court further explained that the custody order "ended upon entry of the Circuit's [sic] Court's assumption of jurisdiction . . . by its entry of the interlocutory order of adoption." (Capitalization normalized).

limiting a court's jurisdiction if these requirements are not met. Given this, and the broad grant of jurisdiction of Code § 17.1-513, the Court finds that the circuit court had subject-matter jurisdiction over the adoption proceeding.[20]

Even so, subject-matter jurisdiction does not mean that circuit courts have unfettered power to rule on any matter that a party claims to be an adoption. The circuit court must still have the power to render a judgment—a requirement related to, but distinct from, subject-matter jurisdiction. The A.s' argument is nominally fashioned under the doctrine of subject-matter jurisdiction. But we understand it as an argument that the circuit court lacked the power to render. We interpret it thus because the two doctrines of subject-matter jurisdiction and the power to render are interlinked and the power to render may be raised sua sponte.[21] *See Hannah v. Commonwealth*, 303 Va. 106, 119-20 (2024).

Since the nineteenth century, our Supreme Court has recognized that, even when a court has subject-matter jurisdiction, an order is void ab initio if "the character of the judgment was not such as the court had the power to render, or because the mode of procedure employed by the court was such as it might not lawfully adopt." *Anthony v. Kasey*, 83 Va. 338, 340 (1887).[22]

---

[20] As noted above in relation to the custody order, this Court has jurisdiction to consider whether the circuit court had subject-matter jurisdiction to issue the interlocutory adoption order. *See supra* note 15. We also note that the interlocutory adoption order is part of the same matter as the final adoption order, and it was issued "subject to" the "final order of adoption" and "converted to [the] Final Adoption Order effective December 3, 2020." *See also Morgan v. Lynchburg Dep't of Soc. Servs.*, No. 0627-21-3, slip op. at 13 (Va. Ct. App. Sept. 13, 2022) (finding "interim ruling denying grandmother's demurrers to" Department of Social Services' emergency removal petitions for children "merged into the final order"). Thus, it does not appear the interlocutory adoption order is still its own freestanding order and instead, it merged into the final adoption order. Even still, because the circuit court left the interlocutory adoption order in place in its May 3 order, we consider it separately here.

[21] See footnote 23 for a further explanation of the connection between subject-matter jurisdiction and the power to render.

[22] *Anthony* relied upon the reasoning of a United States Supreme Court opinion, *Windsor v. McVeigh*, 93 U.S. 274 (1876). There, the Supreme Court reasoned that:

"The Constitution of Virginia sets out the general powers of the judiciary, and the Constitution grants power to the General Assembly, subject to certain limitations, to determine the jurisdiction of the courts of the Commonwealth." *Ellis*, 75 Va. App. at 167 (internal citation omitted). Accordingly, an order is void ab initio "when a court acts outside of such jurisdiction or authority. *Id.*; *see also Yourko v. Yourko*, 74 Va. App. 80, 99 (2021) ("The 'power to render' inquiry requires that Virginia courts must act within the scope of their derived power. Virginia state courts derive their power from Virginia's Constitution, the General Assembly, and grants of power from the federal government."), *rev'd on other grounds*, 302 Va. 149 (2023). An order that is void ab initio is a "complete nullity." *Singh v. Mooney*, 261 Va. 48, 52 (2001).

This Court and our Supreme Court have repeatedly applied this doctrine, including as recently as last year. *See Windset Cap. Corp. v. Debosky*, No. 1216-22-4, slip op. at 8-9 (Va. Ct. App. Sept. 12, 2023) (affirming that the lower court did not have the power to render default judgment where the judgment was based on a null complaint), *cert. granted*, No. 230733, slip op. at 1 (Va. Mar. 5, 2024); *see also Amin v. Cnty. of Henrico*, 63 Va. App. 203, 210 (2014) (holding that a conviction order was void ab initio because it was based on "an offense that did

> Though the court may possess jurisdiction of a cause, of the subject-matter, and of the parties, it is still limited in its modes of procedure, and in the extent and character of its judgments. It must act judicially in all things, and cannot then transcend the power conferred by the law. If, for instance, the action be upon a money demand, the court, notwithstanding its complete jurisdiction over the subject and parties, has no power to pass judgment of imprisonment in the penitentiary upon the defendant. If the action be for a libel or personal tort, the court cannot order in the case a specific performance of a contract. If the action be for the possession of real property, the court is powerless to admit in the case the probate of a will . . . . The judgments mentioned, given in the cases supposed, would not be merely erroneous: they would be absolutely void; because the court in rendering them would transcend the limits of its authority in those cases.

93 U.S. at 282.

not exist"); *Rawls v. Commonwealth*, 278 Va. 213, 221 (2009) (holding that a sentence in excess of statutory limits was void ab initio because it was outside the court's power to render); *Collins*, 274 Va. at 402-03 (holding that a dismissal order was void ab initio because the circuit court utilized a mode of procedure it "could not lawfully adopt"); *Evans v. Smyth-Wythe Airport Comm'n*, 255 Va. 69, 74 (1998) (circuit court "did not have the power to render a judgment which permitted a governmental entity to relinquish the power or right of eminent domain"); *Yourko*, 74 Va. App. at 99 (lower court's order was void ab initio because it was preempted by federal law and therefore the court did not have the power to render it).

We agree with the A.s that the adoption of the child does not fit any of the five categories of adoption authorized in Code §§ 63.2-1221 through -1244. The five categories of adoption are agency, parental placement, stepparent, close relative, and adult adoption. *T.S.G. v. B.A.S.*, 52 Va. App. 583, 591 n.5 (2008); Code §§ 63.2-1221 to -1244. Stepparent, close relative, and adult adoptions are obviously not applicable to the present matter. The circuit court's interlocutory and final adoption orders cite to the agency adoption statutory provisions. And the circuit court did refer the adoption to a child-placing agency, the Department of Social Services, as required by Code § 63.2-1208, and appointed a guardian ad litem. Both recommended that the child be adopted by the M.s. But, again, all this occurred before the child was living with the M.s or present in the United States and neither the Department of Social Services nor the guardian ad litem ever met with the child prior to the issuance of the orders. Thus, the statutory requirements of an agency adoption were not met as the child was not "properly committed or entrusted to [the agency's] care." Code § 63.2-1221. Neither was this a parental-placement adoption, as the child was not placed with the M.s by a "birth parent, legal guardian, or adoptive parent." Code § 63.2-1230. We find that these procedural errors are so outside the scope of the adoption code

that the circuit court lacked the power to render the adoption orders, rendering both adoption orders void ab initio.

## C. *Subject-matter jurisdiction and power to render are essential despite Code § 63.2-1216's language and the statute's general purpose of favoring the finality of adoptions.*

We must now evaluate the role of Code § 63.2-1216 in the A.s' collateral attack on this improper adoption. Of course, our determination that the circuit court lacked the power to render the final adoption order is of little import if the A.s are barred from bringing this claim by Code § 63.2-1216. The statute states:

> After the expiration of six months from the date of entry of any final order of adoption from which no appeal has been taken to the Court of Appeals, the validity thereof shall not be subject to attack in any proceedings, collateral or direct, for any reason, including but not limited to fraud, duress, failure to give any required notice, failure of any procedural requirement, or lack of jurisdiction over any person, and such order shall be final for all purposes.

Code § 63.2-1216. The legislative intent of Code § 63.2-1216 is clear: to favor the finality of adoptions. This Court has stated that "[t]he General Assembly made the policy choice to favor finality, recognizing that repeatedly subjecting a child to multiple changes in or even mere challenges to who his legal parents are has the potential to cause significant harm to the child." *Nelson v. Middlesex Dep't of Soc. Servs.*, 69 Va. App. 496, 509 (2018). Additionally, "[t]he policy of stability in a family relationship, particularly when a young minor is involved, outweighs the possible loss to a person whose rights are cut off through fraud and ignorance." *F.E. v. G.F.M.*, 35 Va. App. 648, 661 (2001) (quoting *McKinney v. Ivey*, 698 S.W.2d 506, 507 (Ark. 1985)).

The combination of the text of Code § 63.2-1216 and the unique nature of subject-matter jurisdiction and the power to render leads us to conclude that Code § 63.2-1216 does not bar collateral attacks challenging a lack of subject-matter jurisdiction or power to render. Subject-matter jurisdiction is essential and necessary to every act taken by a court. *See Watson*, 297 Va.

at 352; *Morrison*, 239 Va. at 170.  Subject-matter jurisdiction is so central to a court's decision-making power that acts undertaken without it are void ab initio.  *Hannah*, 303 Va. at 119-20.  In fact, our Supreme Court

> has recognized five circumstances that may give rise to judgments which are void ab initio: when "(1) [the judgment] was procured by fraud, (2) the court *lacked subject matter jurisdiction*, (3) the court lacked jurisdiction over the parties, (4) the judgment is of a character that *the court lacked power to render*, or (5) the court adopted an unlawful procedure."

*Id.* (alteration in original) (emphasis added) (quoting *Watson*, 297 Va. at 350).  Thus, objections to issues of subject-matter jurisdiction or power to render "may be raised by any party in the case *at any point* during a valid direct or collateral proceeding where the voidness of the order is properly at issue, including by a court for the first time on appeal."  *Id.* at 120 (emphasis added) (citing *Bonanno*, 299 Va. at 736-37).  We therefore conclude that the final adoption order here may be attacked after six months for lack of subject-matter jurisdiction.

Even if the power to render is better understood as a type of jurisdiction,[23] the final adoption order is void ab initio for lacking it.  The power to render, like subject-matter

---

[23] Virginia courts have described the power to render in two different ways, in both instances it is interlinked with subject-matter jurisdiction.  At times, courts have treated the power to render as a related but distinct concept from jurisdiction, and thus from subject-matter jurisdiction.  *See Yourko*, 74 Va. App. at 97 ("[T]he circuit court had subject matter jurisdiction to issue the challenged orders . . . .  However, in examining whether the orders are void, Virginia law looks *beyond jurisdiction* and also directs that an order is void if the circuit court was without power to render the order." (emphasis added)); *Singh*, 261 Va. at 51-52 ("An order is void ab initio if entered by a court in the absence of jurisdiction of the subject matter or over the parties, [or] if the character of the order is such that the court had no power to render it . . . ."); *Anthony*, 83 Va. at 340 ("Though the court may possess jurisdiction of a cause, of the subject-matter and of the parties, it is still limited in its modes of procedure and in the extent and character of its judgments." (quoting *Windsor*, 93 U.S. at 282)).  But at other times, we have conversely treated the power to render as a type of jurisdiction.  Our Supreme Court in *Farant Inv. Corp. v. Francis*, 138 Va. 417 (1924), explained that:

> There are, indeed, four essential requisites to confer upon a court "active jurisdiction," which may be thus classed, (1) potential jurisdiction, (2) territorial jurisdiction, (3) actual jurisdiction of the

jurisdiction, is essential to all orders. *See Hannah*, 303 Va. at 119-20. This conclusion is also consistent with the text of Code § 63.2-1216. We find it significant that the General Assembly affirmatively included "jurisdiction *over any person*," instead of merely stating "jurisdiction." Code § 63.2-1216 (emphasis added). Because challenges based on a lack of subject-matter jurisdiction, or the power to render, can be raised anytime, it is unsurprising that the General Assembly would not intend for Code § 63.2-1216 to prevent them. The unique quality of subject-matter jurisdiction and the power to render distinguishes them from the type of claims listed in Code § 63.2-1216.

Therefore, despite the broad language of Code § 63.2-1216 and the statutory purpose of promoting the finality of adoptions, the statute is inapplicable to the final order, as the order was invalid from the outset.[24] We affirm the circuit court's ruling that the final adoption order is void

---

> subject matter where the proceeding is in rem, and also of the
> proper parties where the proceeding is personal, and (4) the other
> conditions of fact must exist which are demanded by the unwritten
> or statute law as the pre-requisites of the authority of the court to
> proceed to judgment or decree.

*Id.* at 427-28; *see also Richardson v. Commonwealth*, 67 Va. App. 436, 442 n.2 (2017) ("[Jurisdiction] embraces several concepts including subject matter jurisdiction[,] . . . territorial jurisdiction[,] . . . notice jurisdiction[,] . . . and the other conditions of fact [that] must exist which are demanded by the unwritten or statute law as the prerequisites of the authority of the court to proceed to judgment or decree." (first, third, fifth, seventh, and eighth alterations in original) (quoting *Porter v. Commonwealth*, 276 Va. 203, 228 (2008))).

[24] To the extent that our interpretation of Code § 63.2-1216 is lacking, federal preemption principles counsel the same result. A conflict between state and federal law is of particular concern when it involves the United States' diplomatic relationships with other governments. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("[A]t some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government." (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964))). "To permit [states to operate in foreign relations] would be to sanction a dangerous invasion of Federal authority." *United States v. Pink*, 315 U.S. 203, 233 (1942). In addition to "conflict preemption" where particular foreign policy decisions conflict with the operation of a state statute, the United States Supreme Court has recognized a dormant federal foreign affairs power,

ab initio under the right result for the wrong reason doctrine. *See Perry v. Commonwealth*, 280 Va. 572, 579 (2010) ("[I]t is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons." (alterations in original) (quoting *Schultz v. Schultz*, 51 Va. (10 Gratt.) 358, 384 (1853))). Because the final adoption order is void ab initio and the statute is inapplicable, we need not decide if the A.s are de facto parents with due process rights that were violated, which would allow them to overcome the statute's time limitations on yet another ground. *See Commonwealth v. Swann*, 290 Va. 194, 196 (2015) ("The doctrine of judicial restraint dictates that we decided cases '"on the best and narrowest grounds available."'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

## CONCLUSION

Because the circuit court lacked the power to render the interlocutory and final adoption orders and the J&DR court lacked subject-matter jurisdiction to issue the custody order, we find all the orders here void ab initio. We affirm the circuit court's decision voiding the final adoption order but reverse its decision to leave the interlocutory adoption order and custody order in place. We direct the circuit court to dismiss the adoption proceedings and conduct a

---

which is a type of federal field preemption. *Zschernig v. Miller*, 389 U.S. 429, 440 (1968) (invalidating a state action because of the federal government's inherent authority over foreign affairs where the state law had "a direct impact upon foreign relations and may well [have] adversely affected the powers of the central government to deal with those problems"). There was significant evidence presented below that the United States took direct actions in an exercise of federal executive authority by turning over custody of a child found on Afghan soil, during a military engagement, to Afghanistan, and that strict application of Code § 63.2-1216 would conflict with this decision. In the absence of direct action, the dormant foreign affairs doctrine would nevertheless seem to block the statute from preventing the reopening of an adoption of a foreign-born child, while the child was on foreign soil, in an adoption that occurred without the consent (or knowledge) of the foreign country or any agency therein. *See Zschernig*, 389 U.S. at 440 (explaining that preemption principles apply where state action has more than an "incidental or indirect effect" on national foreign relations (quoting *Clark v. Allen*, 331 U.S. 503, 517 (1947))). But we need not decide this case on such grounds, given the power to render rationale contained herein.

hearing on the existing custody petition filed by the A.s, which remains pending before the circuit court.  The M.s may file custody or adoption petitions at their discretion.

*Affirmed in part, reversed in part, and remanded.*